L. A. ANDREW, Receiver, Appellant, v. ARTHUR E. DUNN et al., Appellees.

**DESCENT AND DISTRIBUTION:** Ownership of Property—Corporate
1   Shares of Stock. The heirs of an intestate may not be said to *own* the corporate shares of stock of the intestate, and may not, therefore, be said to be stockholders, (1) when they have never held themselves out as such owners, (2) when there has been no administration on the estate, and (3) when there is no showing as to the extent or distribution of the estate, or as to the debts and the discharge thereof.

**BANKS AND BANKING:** Insolvency—Unauthorized Assessment. A
2   stockholder in an insolvent bank is not liable to an assessment on his stock to discharge the personal obligations of other stockholders that were contracted in effecting a consolidation with a solvent bank, when the stockholder proposed to be assessed did not participate in the said consolidation.

Headnote 1:   14 C. J. p. 1015.   Headnote 2:   7 C. J. p. 504.

Headnote 1:   7 R. C. L. 425.

*Appeal from Lucas District Court.*—E. S. WELLS, Judge.

OCTOBER 19, 1926.

Suit to recover from the heirs of a deceased stockholder in a state bank the amount of an assessment upon the stock. Judgment for defendants. Plaintiff appeals.—*Affirmed.*

*Ben J. Gibson,* Attorney-general, *E. A. Anderson,* and *J. A. Penick,* for appellant.

*Bracewell, Murrow & Poston,* for appellees.

MORLING, J.—The first question is whether the defendants were stockholders in the insolvent bank. J. W. Dunn, the father of the defendants, Arthur and Ida Dunn, died intestate, Decem-

1. DESCENT AND DISTRIBUTION: ownership of property: corporate shares of stock. ber 15, 1919, owning 25 shares in the Derby State Bank. No letters of administration on his estate were ever taken out. He left surviving him two children, the defendants, Arthur and Ida, also a widow, Sarah. It seems to be assumed that there were no other heirs or distributees, and that Sarah was the mother of Arthur and Ida, and that she had no other heirs, though there is no evidence on these points. Sarah died, according to the record, "sometime" after her husband; when, whether testate or intestate, whether her estate has been administered upon or not, are subjects upon which the record is silent. J. W. Dunn at the time of his death was operating a drug store, "owned some real estate," and had a checking account in the Derby State Bank, in which there was $388.64. He also had "possibly some certificates." According to the cashier, the checking account "was automatically transferred from his account to the 'J. W. Dunn estate' account." He also says that the money was so transferred on the order of Arthur and Ida Dunn. A dividend was paid December 31, 1919, and another on December 31, 1920, by crediting them to the account of the "J. W. Dunn estate." After the first dividend was paid, Arthur Dunn said that it "came in mighty nice." The checking on the J. W. Dunn estate account was done by Arthur and Ida Dunn. Sarah Dunn was living at the time the first dividend was paid, but whether she was at the time of the payment of the second does not appear. The record is wholly silent as to the debts, if any, of J. W. Dunn, and as to the existence of any arrangement between the distributees for the adjustment of the widow's rights or their interests as between themselves, or for carrying on the business, or how or for what purpose the money on deposit or other assets of the estate were used. At the time the bank closed, there was a balance in the J. W. Dunn estate account of $187. The defendants kept separate personal checking accounts, in which there were also balances at the time of closing. So far as there is any evidence on the subject, it is that the defendants did not participate in any of the stockholders' meetings. There is no evidence that they ever claimed any rights, assumed any obligations, or held themselves out as stockholders, claimed to own the stock, or secured any personal benefit from the dividends, or even that they were understood by the

bank or its officers to be stockholders, or were recognized or accepted as such. The notice of assessment was directed "to J. W. Dunn estate," and a notice of stockholders' meeting at which it was made was directed to "J. W. Dunn estate, stockholder of the Derby State Bank." Defendants, with their mother, would, after the payment of the debts of the estate, if administration had been taken out, have been the beneficial owners of the residuary interest in the stock, if any. The legal title would have been in the administrator, if one had been appointed; and, during the five years allowed for taking out original administration, the defendants would have no title to the stock on which they could have maintained an action concerning it, and would have no right to it as against the administrator. *Ritchie v. Barnes,* 114 Iowa 67; *In re Estate of Acken,* 144 Iowa 519. The converse must be true, that they would be under no personal liability during that time respecting it. Moreover, they were not the only distributees. We think it is clear that the defendants cannot be held as. owners, and that the payment of the dividends in the manner related cannot be urged as the basis of an estoppel against them.

It is claimed that they are liable on account of having received as heirs or distributees the property of the estate. As has been noted, there is nothing to show the condition of the J. W. Dunn estate at the time of his death: what it consisted of, its value, what the debts were, how they were discharged, what the widow's exemptions would be, or whether any arrangement was made concerning her interest. No claim is made under Section 3407, Code of 1897, as amended by Chapter 117, Acts of the Thirty-ninth General Assembly (Section 12059, Code of 1924), relating to executors in their own wrong, nor is there any basis in the record for applying that section as it stood before the amendment. The officers of the bank knew, at least as early as October 13, 1923, that the bank was insolvent. They gave notice of stockholders' meeting, called for the purpose of "possibly making an assessment," March 26, 1924. The assessment was made at the meeting held on April 30, 1924. These proceedings, as will be seen, are admittedly in the sole interest of officers and other stockholders. The evidence is that the officers knew that no administration had been taken out on the estate; knew that the only way an assessment

could be collected was by the appointment of a receiver and a suit in equity, and that a claim against an estate could be enforced only by the appointment of an administrator and by filing claim. The five years for taking out administration did not expire until December 15, 1924. The lapse of the periods fixed for order of right to make application for letters was no obstacle to an appointment of an administrator by the court. *Crossan v. McCrary,* 37 Iowa 684. There were no equitable circumstances excusing the real claimants from proceeding in the regular way for administration of the estate and filing and establishing their claim. We are of the opinion that no liability of the defendants for the assessment is established.

Further objection to the plaintiff's right of recovery is made on the ground that the alleged debts for which the assessment was made are not such as will sustain an assessment, under

2. BANKS AND
   BANKING: in-
   solvency: un-
   authorized
   assessment.

the statute. By contract made August 13, 1923, the First National Bank agreed to take over the business of the Derby State Bank "by taking enough of acceptable paper and other assets to equal the deposit liability, the borrowing liability, and the capital of the Derby State Bank." The First National Bank assumed the deposit liability and the borrowing liability of the Derby State Bank, and issued "to the Derby State, as evidence of the liability for $35,000 of Derby State capital, the non-negotiable certificate of the First National." The First National Bank was to increase its stock by $25,000, to be open to subscription by the stockholders of the Derby State Bank in such proportion as should be agreed upon between such stockholders. The First National Bank also agreed to add to its directorate four members, to be selected by the stockholders of the Derby State Bank. Committees were to be appointed from each bank, to examine and pass upon the loans and assets of the other. Consolidation was effected October 15, 1924. The First National Bank rejected $82,256.86 of the bills receivable of the Derby State Bank as not acceptable, and later turned back $35,000 of notes as the equivalent of the certificate issued for the capital stock, which they reserved the right to discharge by turning back notes. To make up to the First National Bank the $82,256.86, the directors and officers of the Derby State Bank gave to the First National Bank their own notes and the accom-

modation notes of their friends, to an equivalent aggregate amount. The reason for getting their friends to give accommodation notes was that their own notes would exceed the lending capacity of the First National Bank to individual borrowers. The stockholders and directors gave to their friends their own notes, equivalent to those which the friends had signed, and agreed that they and the Derby State Bank would protect them. The cashier testified:

"The national bank examiner would not permit the merger unless acceptable paper was turned over. The accommodation notes given, the bank examiner said at the time, could be paid off out of the assets of the bank. The board of directors thought the putting up of accommodation notes to take the place of the rejected ones was the plausible way to do it. And that they did not intend to make a gift, to take up the depositors' claims. * * * The accommodation makers were induced to make the notes by agreement of the bank that it would take care of them when they came due. * * * We undertook to take care of those notes when they came due, by voluntary assessment on all the stockholders."

A director testified:

"We had some assets left, and it was the agreement that these were to be taken and handled, and the money that was got out of them was to be paid to the parties who put up the money. We knew from the start that we probably would not get it all; we made individual agreements among each other that those who subscribed and helped us to effect the merger by giving their notes, that we were to take care of them. * * * There is nobody left as creditors but stockholders and directors that participated in and carried on and consummated the merger, outside of some small claims; a good bit of the claims were all held by and the debts were all due to the stockholders and directors who brought about the merger. * * * All of the debts that I knew anything about were created on the 15th of October, 1923. * * * What assessments were collected as a board of directors, we did not proportion among the creditors; we just used it to take up the notes that were given to people that helped us out. * * * We paid the ones that held our notes, and when we paid them, we got our notes back, and some of these notes were filed as claims. * * * We collected all the assessments that we could collect

without a squabble. We could not get enough to pay ourselves, after the outsiders were paid; and we had a receiver appointed for the purpose of collecting assessments from the ones that would not pay; that was probably our real purpose in appointing a receiver, * * * appointed on the 6th day of December, 1924.''

He further says that the bank examiner ''throwed out paper. Anything that was past due, he throwed out, no difference how good the man was behind it. We furnished the money, and took the bank's paper for the charged-off stuff. That is the way we had to do it.''

There is also evidence that they did not take the charged-off paper, but left it in the charge of this director to collect. This witness also says that the bank examiner said, ''we could put in this paper and take out this other, and then collect any profits, etc., and pay this back.''

''I suppose that the only claims that are filed here are the claims based upon this transaction, where some of our directors took up some paper in the bank with either our own money or our own notes, and the claims of the directors' accommodation makers who gave their notes on the 15th of October, 1923, in order to effectuate the merger. That is the whole thing and the whole story, and that is why we want these people to pay an assessment to help pay that money back, and that is the reason why we had a receiver appointed.''

The depositors have all been paid off by the First National Bank. The minutes of the directors' meeting of October 10, 1923, show that:

''All assets and collateral securities that have been charged off the bank's books from the date of the organization, in 1905, to date, unpaid, to be taken care of by the earnings of the bank or by the directors, placed in the hands of trustees to be collected, and the proceeds of collection to be applied first on the outstanding obligations of the general creditors, directors, and any stockholders that might join them in behalf of the bank, balance, if any, to be distributed pro rata to the stockholders.''

The director also testified that the bank examiner ''stated, if we would put up that money, we could be reimbursed out of the resources of the bank, in the way of realizing on charged-off paper and the general resources of the bank, and he demanded

that we make these notes; * * *It was the 13th of October that we received the notice that the First National Bank had rejected $82,000 worth of paper." Also:

"It was our intention to get enough out of the assets rejected by the First National Bank to pay what was due us, and we thought we could do that."

After the consolidation, and before the appointment of a receiver, the board of directors had charge of the assets, payment of debts, selling real estate, collecting on the notes, "operating J. B. Garage, which was a part of the assets," and collecting assessments. According to the testimony at the trial, November 4, 1925, collections were hard to make. Several of the debtors had lately gone into bankruptcy.

The defendants did not in any way participate in any of these matters. It is not shown that they knew anything about the merger agreement, or that they ever claimed any of the stock in the First National Bank, or other benefits of the contract, or that they were recognized in any way as participants or beneficiaries. The stockholders who made the agreement did so on their own responsibility, evidently expecting that the liabilities incurred by them in consequence of it would be paid from left-over assets. They were disappointed by the difficulty of making collections and the insolvency of debtors. They terminated the business for which the bank was organized and its stock sold, not by any process provided by law, but by voluntary agreement, to which the defendants were not parties. The debts claimed for were those incurred by themselves and to themselves, by private arrangement among themselves. In the process of this extra-legal liquidation, they appear to have engaged in the business of operating a garage. The statute declares that the stockholders shall be individually liable to the creditors to an amount equal to their respective shares for all the liabilities of the bank accruing while they remain such stockholders. Section 1882, Code of 1897.

"State and savings banks may contract indebtedness or liability for the following purposes only: for necessary expenses in managing and transacting their business, for deposits, and to pay depositors; provided, that in pursuance to an order of the board of directors previously adopted, other liabilities not in

excess of amount equal to the capital stock may be incurred.''
Section 1855-a, Code Supplement, 1913.

The indebtedness for which this assessment is made, was incurred on a contract for consolidation, by which stock of the First National Bank was to be issued and opened to subscription to stockholders of the Derby State Bank, and by which the stockholders of the Derby State Bank might have four directors on the board of the First National Bank. The Derby State Bank, at the time the contract was made, was evidently unable to continue in business; but the officers and directors would not have any authority to bind a non-participating stockholder to such an agreement. It was the right of the non-participating stockholders to have the business of the bank wound up, the debts paid, and the assets distributed through a receivership. They could not be bound to any contract which would continue them as stockholders in another bank, or which would give to the other stockholders the right to exchange their position as stockholders and directors in the liquidating bank for equivalent positions in another bank. If the Derby State Bank was no longer able to continue business, it was not within the power of the directors and other stockholders to place its assets and business out of its hands, incur obligations in doing so which would be binding upon non-participating stockholders, and continue such a partial business as would result from retaining unliquidated or discredited assets, operating a garage, and prolonging indefinitely and in a crippled condition the operation of the bank. The directors and other stockholders had no power to incur obligations for such purposes and bind the non-participating stockholders to pay an assessment therefor. *Peet v. Des Moines Sav. Bank*, 190 Iowa 1020; *Richmond v. Irons*, 121 U. S. 27, 60; *Schrader v. Manufacturers' Nat. Bank*, 133 U. S. 67; *State ex rel. Carroll v. Corning St. Sav. Bank*, 136 Iowa 79.

The judgment is—*Affirmed*.

DE GRAFF, C. J., and EVANS and ALBERT, JJ., concur.